IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

EDGAR GARCES ROBLES, RAMIRO            §
SOTO ALTAMIRANO, JUAN JOSE SOTO        §
HERNANDEZ, and RODOLFO RUIZ            §
DE LA CRUZ,                            §
                                       §
            Plaintiffs,                §
                                       §
v.                                     §            1:23-CV-981-RP
                                       §
MARIA RAMIREZ, JOHN CIRONE,            §
FELIPE GONZALEZ, RONNY TAYLOR,         §
KINNEY COUNTY, BRAD COE, RICARDO       §
ALVARADO, VAL VERDE COUNTY,            §
JOE FRANK MARTINEZ, and RECANA         §
SOLUTIONS, LLC,                        §
                                       §
            Defendants.                §

## ORDER

Before the Court are several motions to dismiss filed by Defendants Ricardo Alvarado, Brad

Coe, and Kinney County (collectively, the "Kinney County Defendants"), (Dkt. 29); Joe Frank

Martinez and Val Verde County (collectively, the "Val Verde County Defendants"), (Dkt. 35);

Ronny Taylor, (Dkt. 47); Felipe Gonzalez, (Dkt. 51); Recana Solutions, LLC ("Recana"), (Dkt. 59);

John Cirone, (Dkt. 68); and Maria Ramirez, (Dkt. 69). Plaintiffs filed responses to all of the motions

to dismiss.[1] (Dkts. 42, 62, 63, 71, 77, 78). Defendants filed replies to each response. (Dkts. 54, 55,

73, 74, 76, 80, 81). The Court held a hearing on the motions to dismiss on April 30, 2024. (Dkt. 87).

Having reviewed the complaint, the motions to dismiss, the parties' responsive briefing, and the

arguments made during the hearing, the Court enters the following order.

---

[1] Plaintiffs responded to the Kinney County Defendants' motion to dismiss and the Val Verde County
Defendants' motion to dismiss in one filing as the motions raised identical issues. (*See* Resp., Dkt. 43).

# I. BACKGROUND

Plaintiffs allege the following facts. Every month since May 2021, Texas Governor Greg Abbott has renewed a monthly disaster declaration in dozens of Texas counties, including Val Verde and Kinney Counties. (Compl., Dkt. 1, at 1). In doing so, Governor Abbott has been able to roll out a multi-billion-dollar campaign called Operation Lone Star ("OLS"), which seeks to prevent illegal immigration into the United States. (*Id.*). As part of OLS, Texas has deployed law enforcement officers to border communities who arrest individuals under threat of enhanced penalties. (*Id.* at 2). For instance, a person arrested for misdemeanor trespass in Texas will usually not incur much, if any, time incarcerated. But for the same offense, a person in Val Verde or Kinney Counties is subject to "arrest, remote processing, and detention in far-flung state prisons, whether or not they are prosecuted or found guilty." (*Id.* at 1). Governor Abbott has "articulated a policy of 'catch[ing]-and-jail[ing]' migrants in order to deter and delay them from presenting their claims to federal law enforcement." (*Id.* at 2).

For individuals arrested pursuant to OLS in Val Verde and Kinney Counties, the process for release is different than that of other arrestees. Plaintiffs describe a "circuitous and delayed" release process:

> [R]elease orders are sent from the court to the [Val Verde Temporary Processing Center (the "VVTPC")]. The VVTPC and/or [the county sheriff] send the release orders to the [Texas Department of Criminal Justice (the "TDCJ")] prison holding the person. The TDCJ warden has the release paperwork signed by the person to be released. The TDCJ warden sends the executed release paperwork back to the VVTPC for review. The VVTPC physically delivers the release paperwork to [the county sheriff] . . . [The county sheriff] then instructs the jail to release the individual. Then, TDCJ officials further restrain and transport individuals back to the VVTPC, where they are not released except to federal immigration facilities. This process can take

> several days to weeks, assuming it is initiated, and is subject to delay at
> each stage.

(*Id.* at 23; *see also id.* at 26). This release process is "different, slower, and less accurate than the release process for non-OLS arrestees from Val Verde County [and Kinney County], whether those arrestees are released from pretrial detention or following completion of a misdemeanor sentence." (*Id.* at 23; *see also id.* at 27). Plaintiffs allege that this process has had the "predictable and demonstrated consequence of causing Plaintiffs and other individuals" arrested pursuant to OLS to be overdetained. (*Id.* at 24). Plaintiffs also allege that Defendants each had a role in creating, enforcing, and failing to change the OLS release policy, resulting in Plaintiffs' overdetentions. (*Id.* at 22).

## A. Plaintiffs

Plaintiffs were all arrested on allegations of trespassing in either Val Verde or Kinney Counties. (*Id.* at 2). Because they were arrested in these so-declared "disaster" counties, they were subject to the "OLS penological infrastructure." This entailed being detained, processed, and magistrated in a temporary processing center in a tent in a parking lot; being transported from there to state prisons over 100 miles away; being subjected to weeks and months of pretrial detention; and being detained past their legal release dates. (*Id.*). Even upon their release from prison, Plaintiffs were kept in handcuffs and shackles and transported to federal immigration facilities. (*Id.*). Plaintiffs specify that they do not challenge their underlying arrest and detention or the disposition of their charges but rather their continued detention after Texas law mandated their release. (*Id.* at 3 n.1).

Garces Robles was arrested for misdemeanor trespass in Val Verde County in September 2021. (*Id.* at 4). He was detained at VVTPC, which Plaintiffs describe as "a makeshift jail created for the sole purpose of processing individuals arrested under OLS." (*Id.*). A magistrate presiding via video call found probable cause to detain Garces Robles on misdemeanor trespass charges and set bail at $2,500. (*Id.*). Garces Robles was then taken to a state prison, the Dolph Briscoe Unit

("Briscoe"), nearly 150 miles away from VVTPC. (*Id.*). On January 10, 2022, the only charge against Garces Robles—the misdemeanor trespass charge—was dropped. Garces Robles received a court order to direct his release the same day, and his court-appointed defense attorney told him that he was due to be released. (*Id.* at 18). However, Garces Robles was not released for another 19 days. (*Id.*). On January 28, 2022, his attorney contacted staff at Briscoe, the TDCJ, VVTPC, and the Val Verde County Attorney's Office to demand Garces Robles's release. (*Id.*). Garces Robles was then released from Briscoe on January 29, 2022. Upon his release, he was handcuffed by TDCJ officers and taken back to the VVTPC. From there, he was transported to a federal immigration facility. (*Id.*). Garces Robles brings Section 1983 claims for violations of his Fourth and Fourteenth Amendment rights against Martinez, Cirone, Val Verde County, and Recana. He also brings a negligence claim against Recana.

Soto Altamirano was arrested alongside his father, Soto Hernandez, for misdemeanor trespass on August 30, 2021. They were both taken to VVTPC, where a magistrate presiding over video feed found probable cause to detain both Soto Altamirano and Soto Hernandez and set each of their bail at $2,000. (*Id.* at 4–5). Both men were then taken to Briscoe prison. (*Id.* at 5). On September 14, 2021, the Val Verde County Attorney declined to prosecute either Soto Altamirano or Soto Hernandez and sent a letter to Defendant Taylor at VVTPC, stating that the charges had been dropped and recommending that Soto Altamirano and Soto Hernandez be released immediately. (*Id.* at 19). However, Soto Altamirano and Soto Hernandez were not released from Briscoe until 42 days later, on or after October 26, 2021, after their defense attorney contacted staff at Defendant Martinez's office, TDCJ, and Defendant Taylor at VVTPC to ask that they be released. Like Garces Robles, Soto Altamirano and Soto Hernandez were handcuffed upon their release from Briscoe, taken back to VVTPC, and then transported to a federal immigration facility. (*Id.*). Soto Altamirano and Soto Hernandez bring Section 1983 claims for violations of their Fourth and

Fourteenth Amendment rights against Martinez, Ramirez, Val Verde County, Taylor, and Recana. They also bring a negligence claim against Recana.

Ruiz de la Cruz was arrested for misdemeanor trespass in Kinney County on September 24, 2021. (*Id.*). Like the other Plaintiffs, he was taken to VVTPC where a magistrate presiding over a video call found probable cause to detain Ruiz de la Cruz and set his bail at $2,500. (*Id.* at 6). He was then taken to Briscoe prison first, and then transported another 200 miles to the Manuel A. Segovia Unit ("Segovia"). (*Id.*). One hundred and ten days after his arrest, Ruiz de la Cruz was told he could plead no contest and receive a sentence of 80 days incarceration with credit for time served, which would entitle him to immediate release from Segovia. (*Id.* at 21). On January 11, 2022, his defense attorney sent his plea documents to Kinney County officials, including the county attorney. At least one person on the email thread acknowledged receipt of the plea documents. (*Id.*). On January 12, 2024, he entered his plea of no contest, and a court order directing his release was produced that same day. (*Id.* at 6, 21). On January 18, 2022, Ruiz de la Cruz's family emailed his attorney to alert him that Ruiz de la Cruz had not been released. That same day, his counsel emailed the Kinney County attorney and an additional Border Prosecution Unit attorney, notifying them that Ruiz de la Cruz was still in custody. He did not receive any response to his email. (*Id.* at 21). On January 20, 2022, Ruiz de la Cruz's attorney once again emailed the Kinney County attorney and the Border Prosecution Unit attorney. Both attorneys assured Ruiz de la Cruz's counsel that they were looking into the matter. (*Id.*). On January 24, 2022, Ruiz de la Cruz's counsel emailed the two attorneys yet again to notify them that Ruiz de la Cruz was still in custody and no one had provided any explanation. (*Id.* at 21–22). On January 25, 2022, Ruiz de la Cruz's counsel appeared in court via telephone conference to make a record of Ruiz de la Cruz's overdetention. Later that same day— now 13 days past his release date—Ruiz de la Cruz was transported from Segovia directly to a federal immigration facility in both handcuffs and shackles. (*Id.* at 22). Ruiz de la Cruz represents

that during his overdetention he "alerted a jailer to the fact that he was supposed to have been released from custody because he had served his full sentence. He asked why he had not been released and was not given an answer." (*Id.*). Ruiz de la Cruz brings Section 1983 claims for violations of his Fourth and Fourteenth Amendment rights against Coe, Alvarado, Gonzalez, Kinney County, and Recana. He also brings a negligence claim against Recana.

### B. Individual Defendants

The individual Defendants named in this case are all state or county officials "tasked with different and overlapping roles in the OLS criminal legal system." (*Id.* at 2). Plaintiffs, referring to the circuitous relayed process described at length above, allege that the individual Defendants "knowingly and intentionally adopted and implemented policies and promulgated practices and customs that resulted in Plaintiffs' overdetention." (*Id.* at 22). All individual Defendants are sued in their individual capacities.

Martinez is and was at all relevant times the Sheriff of Val Verde County. Plaintiffs allege that he "designed the release procedures for persons arrested in Val Verde County under the 'catch and jail' program and held pursuant to Val Verde County authority." (*Id.* at 24). Plaintiffs further allege that Sheriff Martinez has the power and authority to both implement and change Val Verde County policies and practices and that it his duty to "ensur[e] that individuals in county custody are . . . timely released from custody after all lawful authority to hold them has expired." (*Id.* at 6). Garces Robles, Soto Altamirano, and Soto Hernandez, all arrested in Val Verde County, were in the legal custody of Sheriff Martinez when their overdetentions occurred. (*Id.* at 23). Plaintiffs allege that Sheriff Martinez was aware of and deliberately indifferent to the overdetentions resulting from his OLS release policies and practices. (*Id.* at 24). Further, despite being aware of the overdetentions, Sheriff Martinez "failed to implement simple safeguards mandated by state law to prevent and quickly remedy overdetention." (*Id.*). Plaintiffs allege that Sheriff Martinez's policies, as well as his

failure to implement safeguards, resulted in the 19-day overdetention of Garces Robles and the 42-day overdetentions of Soto Altamirano and Soto Hernandez. (*Id.* at 23).

Coe is and was at all relevant times the Sheriff of Kinney County. Like Sheriff Martinez, he is "responsible for formulating, implementing, and executing the policies, practices and customs applicable to those detained under the authority of Kinney County." (*Id.* at 7). It is his duty to ensure that individuals in county custody are timely released from custody. He has the power and authority to implement and change county policies. (*Id.* at 7). Ruiz de la Cruz, arrested in Kinney County, was in the legal custody of Sheriff Coe. (*Id.* at 24). It is up to Sheriff Coe to decide "whether a person should be released upon receipt of the paperwork in the person's case that has been . . . transmitted to him by the Court." (*Id.* at 25). Specifically, in regard to the release of Ruiz de la Cruz, Sheriff Coe was "required to determine Mr. Ruiz de la Cruz's entitlement to release" once the court sent over the release paperwork. (*Id.* at 26). Because he received Ruiz de la Cruz's release paperwork, which "contains an individual's sentence and the information necessary for the individual's sentence and date of release to be calculated," Sheriff Coe was aware that Ruiz de la Cruz was still in detention 14 days after he pled no contest and was entitled to release. (*Id.* at 25–26). Plaintiffs allege that Sheriff Coe was also aware that the county clerk in Kinney County, Defendant Alvarado, had a policy of waiting several days or weeks to send release paperwork to Sheriff Coe, yet he "has not made any adjustment to account for" such a delay. "These policies, customs, and/or practices have the known and obvious consequence of resulting in overdetention" and resulted in the 13-day overdetention of Ruiz de la Cruz. (*Id.* at 26).

Plaintiffs further allege that Sheriff Coe has a policy or practice of holding individuals indefinitely to effect deportation, which predictably causes overdetentions. (*Id.* at 27). Sheriff Coe has testified that, after a judge orders the release of an OLS detainee, he has contacted Immigration and Customs Enforcement ("ICE") prior to permitting the OLS detainee's release. (*Id.*). He asks

ICE whether it has issued a detainer against the OLS detainee at any point in the past. If ICE answers in the negative, Sheriff Coe inquires if ICE would like to do so. If ICE does not wish to issue a detainer, Sheriff Coe requests formal paperwork from ICE confirming that decision. Sheriff Coe has stated that this process can take days or weeks. (*Id.* at 27–28). Sheriff Coe knows or should know that "such detention is not authorized by federal law." (*Id.* at 28). An ICE detainer authorizes detention for only up to 48 hours following the time an individual is entitled to release. (*Id.* (citing 8 C.F.R. § 287.7)). Plaintiffs allege that Sheriff Coe's practice of "holding individuals indefinitely even after they have received a release order" resulted in the 13-day overdetention of Ruiz de la Cruz. (*Id.*).

Alvarado is and was at all relevant times the county clerk of Kinney County. (*Id.* at 7). Plaintiffs allege that Alvarado is "responsible for formulating, implementing and/or allowing policies customs, and practices applicable to people prosecuted and detained under the authority of Kinney County, including the discharge of routine duties and specifically with respect to release from custody." (*Id.* at 7). He has the power and authority to change policies and practices to comply with applicable laws. (*Id.*). Once an individual in Kinney County custody pleads guilty, the presiding court sends the plea paperwork to County Clerk Alvarado, and it is his responsibility to finalize the plea paperwork by "stamping it, filing it for the record, and returning it to the Kinney County Court for transmission to Defendant Coe." (*Id.* at 25). As mentioned above, the plea paperwork "contains an individual's sentence and the information necessary for the individual's sentence and date of release to be calculated." (*Id.*). Plaintiffs claim that Alvarado has a policy or practice of "delay in stamping plea paperwork and filing it to the record, allowing for some acts to take days to weeks after pleas take place." Specifically, Alvarado has a custom of "*not* promptly stamping and filing paperwork for the record on the day that a plea occurs, even if that plea would result in immediate release." (*Id.* at 25 (emphasis in original)). Subsequently, Alvarado's practice of delay "causes the transmission of

plea paperwork to Defendant Coe to be delayed by days to weeks, because paperwork cannot be transmitted until the Clerk stamps it." (*Id.*). During a court proceeding in January 2022 concerning the ongoing overdetention of Ruiz de la Cruz, an individual identified as a coordinator explained that "plea paperwork for Operation Lone Star cases was not being sent out automatically. Instead, it was being sent out days to a week later, in part because the Clerk's office took an indeterminate number of days to stamp the plea paperwork in each case." (*Id.*). With respect to Ruiz de la Cruz, Alvarado stamped his plea paperwork and filed it for the record 14 days after Ruiz de la Cruz entered his plea. (*Id.*). Plaintiffs allege that Alvarado's policy of waiting to stamp and file plea paperwork resulted in the 13-day overdetention of Ruiz de la Cruz. (*Id.*).

Ramirez was the senior warden of Briscoe from January 2021 to approximately December 2021. (*Id.* at 8). Cirone is and has been the senior warden of Briscoe since January 2, 2022. (*Id.*). Ramirez had physical custody of Soto Altamirano and Soto Hernandez at the time they were overdetained; Cirone had physical custody of Garces Robles at the time he was overdetained. (*Id.* at 29). Gonzalez was the senior warden of Segovia at all relevant times. He had physical custody of Ruiz de la Cruz at the time he was overdetained. (*Id.*). As jail administrators, Ramirez, Cirone, and Gonzalez were responsible for "ensuring that persons in their custody were timely released." (*Id.*). Plaintiffs allege that Ramirez, Cirone, and Gonzalez were "supervisory officials at their respective prisons responsible for creating and implementing and maintaining or changing internal policies for processing the release of" OLS detainees in Briscoe and Segovia pursuant to the release policies created by Kinney and Val Verde Counties. (*Id.* at 29–30). Their internal release procedure policies include "reviewing and processing release paperwork, arranging for detained individuals to sign their release paperwork, and then sending the signed paperwork to VVTPC." They were also responsible for the coordination of transportation and transfer of custody of the OLS detainees. (*Id.* at 30). These policies resulted in release paperwork being processed days to weeks after being received at

both Briscoe and Segovia. Plaintiffs allege that these practices caused the overdetentions of Garces Robles, Soto Altamirano, and Soto Hernandez at Briscoe, and the overdetention of Ruiz de la Cruz at Segovia. (*Id.*). Plaintiffs also plead that Ramirez, Cirone, and Gonzalez had knowledge of and were deliberately indifferent to the overdetentions of OLS detainees resulting from their policies and practices. Specifically, Plaintiffs allege that Ramirez received "documentation from the Kinney County Attorney dismissing the cases against individuals; correspondence about overdetention from attorneys; and an order from a judge directing that she release individuals to their attorneys without further delay or transportation." (*Id.* at 31).

Taylor was hired by the Texas Department of Emergency Management ("TDEM") to help "design, administer, and operate the VVTPC, including the processes involved at the VVTPC for intake and release." (*Id.* at 9). Taylor operated VVTPC from around July to November 2021. Then from September 2021 to November 2021, he operated VVTPC in conjunction with Defendant Recana. (*Id.*). He was responsible for "formulating, implementing, and executing policies, customs, and practices applicable to the VVTPC," as well as "training and supervising VVTPC staff." (*Id.*). Plaintiffs allege that the release procedures that Taylor or Recana were responsible for were "reviewing and processing release paperwork and sending paperwork to the wardens of Briscoe and Segovia prisons and the Kinney and Val Verde County Sheriffs." (*Id.* at 31). Plaintiffs claim that Taylor created and implemented policies at VVTPC that resulted in release paperwork being processed days to weeks after being received. Finally, "unlike non-OLS Val Verde and Kinney County arrestees, OLS arrestees typically are not free to leave [upon release from detention] and are transported back to the VVTPC after their release, where they are not free to leave, and they remain in a cell until they are transported to federal immigration facilities." (*Id.*). Plaintiffs allege that Taylor and/or Recana's practices were applicable to all four Plaintiffs' release processes and caused all Plaintiffs' overdetentions. (*Id.*).

### C. County Defendants

Plaintiffs bring claims for violation of their Fourth and Fourteenth Amendment rights against Val Verde and Kinney Counties pursuant to *Monell*. Val Verde County is a political subdivision of Texas with its county seat in Del Rio. Plaintiffs allege that it is "responsible for the policies, practices, and/or customs involved in the detention and release of people arrested in Val Verde County, including under OLS." (*Id.* at 6–7). Val Verde County initiated and was responsible for the prosecution and detention of Garces Robles, Soto Hernandez, and Soto Altamirano. (*Id.* at 7). Val Verde County had legal custody of these Plaintiffs during their overdetentions. (*Id.* at 23). Kinney County is a political subdivision of Texas with its county seat in Brackettville. Like Val Verde County, Plaintiffs allege that Kinney County is "responsible for the policies, practices, and/or customs involved in the detention and release of people arrested in Kinney County, including under OLS." (*Id.* at 7–8). Kinney County had legal custody of Ruiz de la Cruz during his overdetention. (*Id.* at 24). Plaintiffs allege that Sheriff Martinez is a final policymaker for Val Verde County and that Sheriff Coe and County Clerk Alvarado are final policymakers for Kinney County. (*Id.* at 24, 28).

### D. Recana

Plaintiffs bring claims against Recana for violations of their Fourth and Fourteenth Amendment rights pursuant to Section 1983 as well as for negligence. Recana is a government contracting and staffing company. (*Id.* at 9). It operated VVTPC alongside Taylor from September 2021 through November 2021 and independently thereafter. Recana acted pursuant to a contract with TDEM and under the color of state law. (*Id.*). Plaintiffs allege that Recana was "responsible for creating and implementing internal policies for processing the detention and release of individuals detained under the 'catch and jail' program." (*Id.* at 31). Specifically, Recana was tasked with "reviewing and processing release paperwork and sending paperwork to the wardens of Briscoe and Segovia prisons and the Kinney and Val Verde County Sheriffs." (*Id.*). Recana's internal policies

implemented in carrying out these tasks "resulted in release paperwork being processed days to weeks after being received." (*Id.*). Finally, "unlike non-OLS Val Verde and Kinney County arrestees, OLS arrestees typically are not free to leave [upon release from detention] and are transported back to the VVTPC after their release, where they are not free to leave, and they remain in a cell until they are transported to federal immigration facilities." (*Id.*). Plaintiffs claim that Recana and/or Taylor's practices were applicable to all four Plaintiffs' release processes and caused all Plaintiffs' overdetentions. (*Id.*).

## II. RULE 12(b)(6) STANDARD

Pursuant to Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a 12(b)(6) motion, a "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A court ruling on a 12(b)(6) motion may rely on the

complaint, its proper attachments, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (citations and internal quotation marks omitted). A court may also consider documents that a defendant attaches to a motion to dismiss "if they are referred to in the plaintiff's complaint and are central to her claim." *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). But because a court reviews only the well-pleaded facts in the complaint, it may not consider new factual allegations made outside the complaint. *Dorsey*, 540 F.3d at 338. "[A] motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

## III. DISCUSSION

### A. Overdetention

Section 1983 provides an avenue for individuals to assert violations of preexisting federal rights. 42 U.S.C. § 1983; *see Albright v. Oliver*, 510 U.S. 266, 271 (1994) ("Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred.") (internal quotation marks and citation omitted). "To bring an action within the purview of section 1983, a claimant must first identify a protected life, liberty, or property interest, and then prove that government action resulted in a deprivation of that interest." *San Jacinto Sav. & Loan v. Kacal*, 928 F.2d 697, 700 (5th Cir. 1991) (citing *Baker v. McCollan*, 443 U.S. 137, 140 (1979)).

Plaintiffs plead that Defendants' actions resulted in violations of their Fourth and Fourteenth Amendment rights. (Compl., Dkt. 1, at 32–36). Several Defendants claim in their motions to dismiss that Plaintiffs fail to state a claim for violation of the Fourteenth Amendment because overdetention is covered by the Fourth Amendment right to be free from unreasonable seizure. (*See* Dkt. 47, at 7; Dkt. 51, at 5; Dkt. 59, at 12; Dkt. 68, at 8; Dkt. 69, at 9). For example, in

her motion to dismiss, Ramirez states that "it is well-established that the Fourth Amendment governs the standard for probable cause necessary to effect a detention, as well as the minimum constitutional standards and procedures for detention." (Dkt. 69, at 11 (citing *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975))). She, and many of the other Defendants, argue that only "a plaintiff whose claim is not susceptible to proper analysis with reference to a specific constitutional right may still state a claim under § 1983 for a violation of his or her Fourteenth Amendment substantive due process right, and have the claim judged by the constitutional standard that governs that right." (*Id.* at 10 (citing *Petta v. Rivera*, 143 F.3d 895, 901 (5th Cir. 1998))). Ramirez alleges that the "proper analysis . . . remains under the Fourth Amendment, not the Fourteenth Amendment." (*Id.* at 12). In response, Plaintiffs argue that the Fifth Circuit has not explicitly addressed what constitutional amendment covers an overdetention claim. (Resp., Dkt. 78, at 9). Plaintiffs also argue that Defendants fail to provide any authority supporting their claims that the Fourth Amendment exclusively governs overdetention claims. (*Id.* at 9). Finally, Plaintiffs argue that they sufficiently plead both a Fourth and Fourteenth Amendment claim against Defendants, "making it unnecessary for this Court to address whether only one amendment applies." (*Id.* at 8).

The Court agrees with Plaintiffs that the Fifth Circuit has never explicitly stated whether overdetention falls under a certain amendment. However, as recently as January 2024, the Fifth Circuit has made clear that overdetention implicates due process. *See McNeal v. LeBlanc*, 90 F.4th 425, 431 (5th Cir. 2024) ("We recently held that it is without question that holding without legal notice a prisoner for a month beyond the expiration of his sentence constitutes a denial of due process." (cleaned up)); *see also Hicks v. LeBlanc*, 81 F.4th 497, 504 (5th Cir. 2023) ("Clear as day, the government cannot hold an inmate without the legal authority to do so, for that would deprive a person of his liberty without due process of law." (cleaned up)); *Parker v. LeBlanc*, 73 F.4th 400, 407 (5th Cir. 2023) ("Detention of a prisoner thirty days beyond the expiration of his sentence in the

absence of a facially valid court order or warrant constitutes a deprivation of due process." (cleaned up)); *Crittindon v. LeBlanc*, 37 F.4th 177, 188 (5th Cir. 2022) ("[I]t is without question that holding without legal notice a prisoner for a month beyond the expiration of his sentence constitutes a denial of due process."). In 2023, the Fifth Circuit stated that "the right to timely release was clearly established well before 2017" and cited a case where the Fifth Circuit discussed overdetention as a due process issue. *Hicks*, 81 F.4th at 504 (5th Cir. 2023) (citing *Douthit v. Jones*, 619 F.2d 527, 532 (5th Cir. 1980) ("Detention of a prisoner thirty days beyond the expiration of his sentence in the absence of a facially valid court order or warrant constitutes a deprivation of due process.")). It is without question that the Fifth Circuit considers overdetention to fall within the Fourteenth Amendment.

Yet, as Plaintiffs note, the Fifth Circuit has never held that overdetention cannot be a violation of the Fourth Amendment. Other circuits have analyzed overdetention claims under different constitutional provisions. *Compare Beto v. Barkley*, 706 F. App'x 761, 768 (3d Cir. 2017) ("We have held that the detention of an inmate beyond the termination of his sentence violates the Eighth Amendment's proscription against cruel and unusual punishment if the incarceration is without penological justification." (cleaned up)), *with Morales v. Chadbourne*, 793 F.3d 208, 215 (1st Cir. 2015) ("It was thus clearly established well before [Plaintiff] was detained in 2009 that immigration stops and arrests were subject to the same Fourth Amendment requirements that apply to other stops and arrests—reasonable suspicion for a brief stop, and probable cause for any further arrest and detention."), *and Davis v. Hall*, 375 F.3d 703, 713 (8th Cir. 2004) ("[A] person's liberty is protected from unlawful state deprivation by the due process clause of the Fourteenth Amendment.").

The Court finds that Plaintiffs sufficiently plead both a Fourth and Fourteenth Amendment claim against Defendants.[2] Indeed, some of Plaintiffs' allegations lend themselves better to a due

---

[2] Several Defendants argue that Plaintiffs are precluded from bringing procedural due process claims because of *Younger* abstention. (Dkt. 47, at 9; Dkt. 51, at 6; Dkt. 68, at 10; Dkt. 69, at 11). The Fifth Circuit has never specifically addressed whether overdetentions are a violation of procedural due process or substantive due

process claim—being kept in prison after entitlement to release—and some to an unreasonable seizure claim—being transported to VVTPC and federal immigration centers in restraints after release from prison. *See Barnes v. D.C.*, 242 F.R.D. 113, 118 (D.D.C. 2007) ("Plaintiffs allege that, despite being entitled to release, they were taken back into custody and transported to [detention centers] . . . . [T]hey allege that they essentially were re-arrested or re-seized. These allegations of Fourth Amendment violations are sufficient to survive a motion to dismiss . . . ."). At this stage, the Court will focus on whether Plaintiffs sufficiently plead that Defendants are liable under Section 1983 for Plaintiffs' overdetentions, as there is no question whether the right to timely release from prison is a constitutional right. *Crittindon*, 37 F.4th at 188 (5th Cir. 2022) ("This Court has recognized the clearly established right to timely release from prison." (internal citations omitted)).

### B. Section 1983 Claims Against Supervisory Officers

Under Section 1983, "supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability." *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987). Therefore, a supervisory official may be held directly liable "only if he affirmatively participates in the acts that cause the constitutional deprivation." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011). However, in some circumstances, "[s]upervisory officials may be liable under § 1983 for their failure to adopt policies if that failure causally results in a constitutional injury." *Crittindon*, 37 F.4th at 186.

In their motions to dismiss, the individual Defendants generally allege the following arguments as to why Plaintiffs' complaint should be dismissed for failure to state a Section 1983 claim against them: (a) Plaintiffs fail to allege sufficient facts to show that Defendants affirmatively acted to cause Plaintiffs' overdetentions; (b) Plaintiffs fail to allege sufficient facts to show that Defendants failed to adopt policies and that their failure to adopt caused Plaintiffs' overdetentions;

---

process. Regardless, the Fifth Circuit "has held that requests for monetary damages do not fall within the purview of the *Younger* abstention doctrine." *Allen v. Louisiana State Bd. of Dentistry*, 835 F.2d 100, 104 (5th Cir. 1988). Plaintiffs only ask for monetary damages in this action, making *Younger* abstention a non-issue.

and (c) Plaintiffs' complaint negates itself by alleging that multiple Defendants are liable for the same overdetentions.

    1. Plaintiffs sufficiently allege that Defendants Alvarado and Taylor affirmatively acted to cause some of Plaintiffs' overdetentions.

"A supervisory official may be held liable if he 'affirmatively participates in the acts that cause the constitutional deprivation.'" *Crittindon*, 37 F.4th at 188 (quoting *Porter*, 659 F.3d at 446). In order to hold a defendant liable under this theory of direct participation, "[a] plaintiff must show the defendant's deliberate indifference to plaintiff's constitutional rights." *Crittindon*, 37 F.4th at 188. A showing of deliberate indifference "requires evidence that an official 'disregarded a known or obvious consequence of [their] action[s].'" *Crittindon*, 37 F.4th at 188 (quoting *Porter*, 659 F.3d at 446–47). Plaintiffs' complaint alleges that County Clerk Alvarado affirmatively participated in acts that caused overdetention of Ruiz de la Cruz, (Compl., Dkt. 1, at 25), and that Taylor, director of VVTPC, affirmatively participated in acts that caused overdetentions of Soto Hernandez and Soto Altamirano, (*id.* at 19).

In his motion to dismiss, Alvarado contends that he is either entitled to judicial or qualified immunity. (Mot. Dismiss, Dkt. 29, at 10–11). He briefly states that "[Ruiz de la Cruz] has not pled and cannot show that County Clerk Alvarado personally violated Plaintiff's constitutional rights." (*Id.* at 11). However, he makes no specific arguments regarding the deficiency of Plaintiffs' pleadings. The Court will address Alvarado's potential immunity below. For now, the Court finds that Ruiz de la Cruz sufficiently states a direct participation claim against Alvarado.

Plaintiffs plead that Alvarado was aware of the risk that Ruiz de la Cruz was being overdetained. Specifically, Plaintiffs allege that Defendant Alvarado "is responsible for finalizing plea paperwork by stamping it, filing it for the record, and returning it to the Kinney County Court for transmission to Defendant Coe." (Compl., Dkt. 1, at 25). Ruiz de la Cruz pled no contest to a misdemeanor trespass charge on January 12, 2021. (*Id.* at 21). He was sentenced to 80 days in

custody with credit for time served, entitling him to immediate release. (*Id.*). Plaintiffs allege that Alvarado stamped Ruiz de la Cruz's time served plea paperwork and filed it for the record 14 days after the plea was entered. (*Id.* at 25). Plea paperwork contains an individual's sentence and the information necessary for the individual's sentence and date of release to be calculated. (*Id.*). The Court finds that Plaintiffs' complaint sufficiently alleges that Alvarado would have known from the face of the plea paperwork that Ruiz de la Cruz was at risk of overdetention. Taking Plaintiffs' well-pleaded facts as true, as the Court must at this stage of the proceedings, Plaintiffs successfully state a claim of direct participation against Alvarado, who allegedly had notice of Ruiz de la Cruz's entitlement to release and risk of overdetention on or around January 12, 2021, yet waited 14 days to stamp and file the paperwork for the record so that Ruiz de la Cruz's release process could proceed.[3]

Similarly, Taylor, who operated VVTPC independently from July 2021 to September 2021 and in conjunction with Recana from September 2021 through November 2021, (*see* Compl., Dkt. 1, at 9), argues that "Plaintiffs largely rely on language cited from federal and state case law establishing their right to timely release and vague factual assertions, but do not allege specific facts demonstrating Taylor's personal involvement in their purported over-detentions." (Mot. Dismiss, Dkt. 47, at 4). The Court disagrees with Taylor. In their complaint, Plaintiffs allege that the Val Verde County Attorney sent a letter to Taylor on September 14, 2021, notifying him that Val Verde County was declining to prosecute Soto Hernandez and Soto Altamirano and recommending their immediate release. (Compl., Dkt. 1, at 19). Plaintiffs further plead that Soto Hernandez and Soto Altamirano were not released until October 26, 2021. (*Id.*). Thus, Plaintiffs sufficiently plead that Taylor had notice that Soto Hernandez and Soto Altamirano were at risk of overdetention, yet he took no action. Given Taylor's role in the OLS detainee release process, as described in Plaintiffs'

---

[3] Defendant Alvarado attached several exhibits to his motion to dismiss in order to dispute his involvement with Ruiz de la Cruz's plea paperwork. However, the Court struck these exhibits at the motions hearing on April 30, 2024 because those exhibits are not properly before the Court as part of a 12(b)(6) motion.

complaint and in Section I of this order, Plaintiffs sufficiently plead that Taylor disregarded the risk of overdetention of Soto Hernandez and Soto Altamirano by failing to act promptly in response to the letter. Taylor argues that Plaintiffs fail to plead that he actually received that letter, (Mot. Dismiss, Dkt. 47, at 5), but the Court finds that Plaintiffs' pleadings as to the letter are sufficient to survive a 12(b)(6) standard.

Because Plaintiffs allege that Alvarado and Taylor both knew that their personal actions, or lack thereof, would specifically cause Soto Hernandez, Soto Altamirano, and Ruiz de la Cruz's overdetentions, the Court finds that Plaintiffs sufficiently state an overdetention claim of direct liability against Alvarado and Taylor pursuant to Section 1983.

2. Plaintiffs sufficiently allege that all of the individual Defendants' failure to adopt policies caused Plaintiffs' overdetentions.

"Supervisory officials may be liable under § 1983 for their failure to adopt policies if that failure causally results in a constitutional injury." *Crittindon*, 37 F.4th at 186. However, "[l]iability only arises when the officials act, or fail to act, with 'deliberate indifference,' a 'disregard [for] a known or obvious consequence of [their] action[s].'" *Id.* (quoting *Porter,* 659 F.3d at 446). Therefore, "Plaintiffs must introduce evidence that each Defendant had 'actual or constructive notice' that their failure to adopt policies would result in constitutional violations." *Id.* (quoting *Porter*, 659 F.3d at 447). "This typically requires showing notice of '[a] pattern of similar constitutional violations' due to deficient policies, permitting the inference that Defendants deliberately chose policies causing violations of constitutional rights." *Id.* (quoting *Porter*, 659 F.3d at 447).

Plaintiffs allege that all of the individual Defendants were deliberately indifferent to Plaintiffs' right to timely release by failing to adopt policies that would address the delays caused by the unique and circuitous release process for OLS detainees. (Compl., Dkt. 1, at 32, 34). Plaintiffs further allege that each individual Defendant was in a position of authority such that they could have adopted policies to cure these deficiencies. (*Id.* at 6–9). The question, then, is whether Plaintiffs

sufficiently plead that the individual Defendants had notice of a pattern of overdetentions. The Court finds that they do.

First, Plaintiffs plead that there was a pattern of overdetentions as a result of the OLS release process. In their complaint, Plaintiffs allege that "Defendants additionally overdetained 80 people at approximately the same time that they overdetained Plaintiffs, from late September 2021 to January 2022. (Compl., Dkt. 1, at 16). Plaintiffs further allege that "[a]t the time of Plaintiffs' overdetention, all Defendants knew that individuals were overdetained under the 'catch and jail' program." (*Id.*). Specifically, Plaintiffs state that "Defendant Taylor testified at a contempt hearing on June 2, 2022, that during the relevant time period, it was 'not uncommon' to receive emails from defense attorneys explaining that their clients were entitled to release and suffering ongoing overdetention." (*Id.*). Taylor also testified that he regularly forwarded these emails to "Val Verde and Kinney Counties" and "TDCJ employees at Briscoe and Segovia Prisons." Plaintiffs allege that Recana similarly forwarded emails complaining of overdetentions to the other Defendants and that Ramirez, Cirone, and Gonzalez regularly received complaints about overdetentions through the inmate grievance system. (*Id.*). Plaintiffs also allege that Ramirez received "documentation from the Kinney County Attorney dismissing the cases against individuals; correspondence about overdetention from attorneys; and an order from a judge directing that she release individuals to their attorneys without further delay or transportation." (*Id.* at 31). And if that was not sufficient for Defendants to have notice of a pattern of overdetentions as a result of the OLS release policy, Plaintiffs also point out that "occurrences of overdetention were sufficiently widespread, persistent, and reported upon that Defendants should have known about the overdetention of people in their custody." (*Id.* (citing to an NBC News article discussing overdetentions of more than 200 OLS detainees)).

Second, the OLS release process, as described in Plaintiffs' complaint, inherently suggests that each individual Defendant knew that OLS detainees were regularly being overdetained.

Plaintiffs refer to the OLS release policy as "circuitous and delayed." (*Id.* at 23). Release paperwork bounces from desk to desk, often ending up in front of many of the Defendants multiple times. (*Id.*). Plaintiffs claim that this process is "different, slower, and less accurate than the release process for non-OLS arrestees" in Val Verde and Kinney Counties. (*Id.* at 23, 27). Each of the individual Defendants had a role in that release process: the clerks send release paperwork to the county sheriffs, the sheriffs send it to VVTPC which then sends it to the prisons, the prisons then deliver it back to VVTPC, and finally VVTPC gives the processed paperwork back to the county sheriffs. (*Id.* at 23, 26–27). When Defendants have a detainee's release paperwork in front of them, they know that that detainee is entitled to release and that there is no longer a legal basis to continue their detention. At the same time, according to Plaintiffs, each stage of this release process is subject to delays and can take several days to weeks. (*Id.* at 23). The OLS release policy, as Plaintiffs plead it, shows that Defendants knew or should have known that OLS detainees were being overdetained. *See Traweek v. Gusman*, 414 F. Supp. 3d 847, 869 (E.D. La. 2019) (finding that a defendant had notice of an overdetention because she "knew or should have known that [the plaintiff] was entitled to release once she saw his paperwork" but "failed to generate his certificate of release until the afternoon of the following day").

3. Plaintiffs' complaint does not negate itself by alleging that multiple Defendants caused Plaintiffs' overdetentions.

Several Defendants argue that they cannot be found liable for causing a Plaintiff's overdetention if another Defendant is also accused of being liable for causing that Plaintiff's overdetention. (Dkt. 29, at 11–12; Dkt. 35, at 8–9; Dkt. 47, at 5; Dkt. 68, at 8; Dkt. 69, at 9). For instance, Sheriff Coe alleges that he cannot be liable for Ruiz de la Cruz's overdetention because it was Alvarado, the county clerk, who failed to timely stamp and file Ruiz de la Cruz's release paperwork, (*see* Dkt. 29, at 11–12), and Ramirez argues that "Plaintiffs' own allegations contend that the Sheriff retains authority over time calculation and release, not the TDCJ prison units that are

simply cooperating with the Sheriff's request that TDCJ hold individuals arrested for trespass," (*see* Dkt. 69, at 9).

The Court disagrees with Defendants' arguments that only one state actor may be liable for Plaintiffs' overdetentions. As Plaintiffs correctly state, "joint conduct and harm resulting from multiple people's actions can give rise to liability under Section 1983 for each responsible party, and shifting blame is no defense in the face of a clear constitutional and state law obligation to ensure that persons are released in a timely manner." (Resp., Dkt. 42, at 14). The Fifth Circuit has found multiple defendants responsible for violations of constitutional rights pursuant to Section 1983 on many occasions. *See Hicks*, 81 F.4th at 505; *Crittindon*, 37 F.4th at 187; *James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) (holding that participants who are "integral to" alleged constitutional violations may be liable under Section 1983); *Dobson v. Camden*, 705 F.2d 759, 768 (5th Cir. 1983) (applying Texas's proportionate responsibility statute to a Section 1983 claim); *see also Traweek*, 414 F. Supp. 3d at 867 (district court found that a plaintiff sufficiently pled that Department of Corrections employee was liable for a portion of the plaintiff's overdetention by failing to timely prepare a certificate of release). Plaintiffs' complaint clearly alleges that each of the Defendants in this case either had a role in creating and enforcing the circuitous release policy that resulted in Plaintiffs' overdetentions or failed to use their authority to adopt policies that would have addressed the overdetentions. Further, Defendants do not cite any case law holding that multiple defendants cannot be found liable for the same violation of a constitutional right. Accordingly, the Court gives no credit to Defendants' contentions that Plaintiffs' pleadings negate Defendants' liability by implicating multiple Defendants.

### C. Immunity of Supervisory Officials

1. County Clerk Alvarado is not entitled to judicial immunity.

Defendant Alvarado, the Kinney County Clerk, claims that he is entitled to judicial immunity.[4] (Mot. Dismiss, Dkt. 29, at 9). "Absolute immunity from damages actions applies, only in a narrow range of actions, for clerks of court acting in a nonroutine manner under command of court decrees or under explicit instructions of a judge." *Williams v. Wood*, 612 F.2d 982, 985 (5th Cir. 1980). On the other hand, court clerks enjoy "only qualified immunity for those routine duties not explicitly commanded by a court decree or by the judge's instructions." *Clay v. Allen*, 242 F.3d 679, 682 (5th Cir. 2001).

Plaintiffs' complaint states that Alvarado "has a policy . . . of delay in stamping plea paperwork and filing it to the record, allowing for some acts to take days to weeks after pleas take place." (Compl., Dkt. 1, at 25). Further, in the case of Ruiz de la Cruz, Alvarado "stamped the time served paperwork and filed it for the record 14 days after the plea was entered." (*Id.*). Alvarado's delays are not at the order of the judge. When Alvarado stamps and files paperwork in a delayed manner, he is performing a routine duty at his own discretion. *See Williams*, 612 F.2d at 985 ("In entering an order and notifying the parties a clerk of court enjoys qualified but not absolute immunity."). Therefore, the Court finds that Alvarado is not entitled to judicial immunity. The Court will address Alvarado's qualified immunity defense in the following section.

---

[4] In his motion to dismiss, Alvarado argues that the Court should consider absolute immunity under a 12(b)(1) motion to dismiss. However, absolute immunity is an affirmative defense properly brought under a 12(b)(6) motion to dismiss. *Cozzo v. Tangipahoa Par. Council*, 279 F.3d 273, 283 (5th Cir. 2002); *Geraci v. City of Austin*, No. 1:19-CV-00340-SH, 2020 WL 1644004, at *2 (W.D. Tex. Apr. 2, 2020). Thus, the Court considers Alvarado's absolute immunity defense under a 12(b)(6) standard along with Alvarado's qualified immunity defense.

2. Plaintiffs sufficiently plead that the individual Defendants are not entitled to qualified immunity.

"The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011). There are two steps to determining whether a defendant is protected by qualified immunity. *Saucier v. Katz*, 533 U.S. 194 (2001). First, the court asks whether the official "violated a statutory or constitutional right." *Morgan*, 659 F.3d at 371 (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011)). Second, the court asks whether "the right was 'clearly established' at the time of the challenged conduct." *Id.* (quoting *al-Kidd*, 131 S. Ct. at 2083). Courts have the discretion to decide the order in which to answer these two prongs. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). While there need not be "a case directly on point . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 136 S. Ct. at 308 (quoting *Ashcroft v. al–Kidd,* 563 U.S. 731, 741 (2011)). In the context of a pretrial motion, the Court must determine whether an officer is entitled to qualified immunity in light of the applicable standard of review. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (stating that courts should evaluate qualified immunity based on the defendant's conduct "as alleged in the complaint" at the motion to dismiss stage).

The Court has already found that Plaintiffs sufficiently plead that the individual Defendants violated Plaintiffs' constitutional rights to timely release either through direct or supervisory liability. Therefore, the Court will now address whether the right to timely release was clearly established at the time of Defendants' conduct. When considering whether a right is clearly established, courts look to decisions from the Supreme Court and circuit courts for guidance. *Hicks*, 81 F.4th at 503.

The Fifth Circuit has repeatedly held that individuals have a clearly established right to their timely release from custody. *See Crittindon*, 37 F.4th at 188 ("This Court has recognized the 'clearly established right to timely release from prison.'"); *Parker*, 73 F.4th at 408; *Hicks*, 81 F.4th at 504 ("Clear as day, the government cannot hold an inmate without the legal authority to do so, for that would deprive a person of his 'liberty . . . without due process of law." (internal citation omitted)). This principle is "long-held" and became clearly established "well before" Defendants caused Plaintiffs' overdetention in 2021. *Hicks*, 81 F.4th at 504 (holding that the right to timely release was clearly established as of 2017).[5] "Ultimately, the touchstone is fair warning: The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Crittindon*, 37 F.4th at 186 (internal citations omitted).

The question is then whether the individual Defendants acted objectively unreasonably. *See Porter*, 659 F.3d at 445 ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." (internal citations omitted)). The Court finds that on the facts that Plaintiffs plead, the individual Defendants' actions were objectively unreasonable. Alvarado had "fair warning" that his failure to timely process Ruiz de la Cruz's paperwork would deny him immediate release. *See Crittindon*, 37 F.4th at 188 (defendant prison officials who knew of delays in release paperwork had "fair warning that their failure to address this delay would deny prisoners their

---

[5] Defendant Gonzalez states that although there is a timely right to release, there is not a right to instantaneous release. (Mot. Dismiss, Dkt. 51, at 7 (citing *Crittindon*, 37 F.4th at 188)). Gonzalez argues that *Crittindon*, which recognized that individuals held for more than 30 days past the time their sentences expire are denied due process, established a "30-day threshold" under which any person held less than 30 days cannot state a claim for relief. Thus, Gonzalez argues that Ruiz de la Cruz has failed to state an overdetention claim because he was only overdetained for 13 days. Gonzalez himself concedes that courts have declined to define the amount of delay that is reasonable. (*See* Mot. Dismiss, Dkt. 51, at 7). The Court finds that *Crittindon* does not hold that a plaintiff must be overdetained for at least 30 days to state a viable overdetention claim.

immediate or near-immediate release" (internal citations omitted)). Taylor had fair warning that his failure to act upon notice that Soto Hernandez and Soto Altamirano were being overdetained would result in their continued overdetentions. And all of the individual Defendants, including Alvarado and Taylor, acted objectively unreasonably in failing to address the constitutionally deficient release policy for OLS detainees, which they knew was causing a pattern of overdetentions.[6]

### D. Section 1983 Municipal Liability

Municipal liability under Section 1983 requires proof of three elements: "(1) an official policy (2) promulgated by the municipal policymaker (3) [that] was the moving force behind the violation of a constitutional right." *Johnson v. Harris Cnty.*, 83 F.4th 941, 946 (5th Cir. 2023) (internal citations omitted); *see also Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91 (1978). An official policy "usually exists in the form of written policy statements, ordinances, or regulations, but it may also arise in the form of a widespread practice that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009) (internal quotations omitted). To sufficiently plead that a practice is so persistent and widespread as to have the force of law, a plaintiff's description of the alleged policy cannot be conclusory and must contain specific facts. *Johnson*, 83 F.4th at 946. Like government-defendants sued in their individual capacity, "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691.

---

[6] In their motions to dismiss, Defendants argue that overdetention claims fall exclusively under the Fourth Amendment. As discussed above, Fifth Circuit precedent has held that overdetention is a violation of due process although the Fifth Circuit has never found that overdetention cannot also violate the Fourth Amendment. Although Defendants do not raise this argument in their motions to dismiss, in an abundance of caution, the Court finds that it is also clearly established that the Fourth Amendment freedom from unreasonable seizures "applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni–Ponce*, 422 U.S. 873, 878 (1975) (citing *Davis v. Mississippi*, 394 U.S. 721 (1969); *Terry v. Ohio*, 392 U.S. 1, 16–19 (1968)). Thus, Defendants would have had fair warning that illegal continued detentions of Plaintiffs, even short detentions to transport Plaintiffs to federal immigration centers, would violate Plaintiffs' Fourth Amendment rights.

In their motions to dismiss, Kinney and Val Verde Counties argue that Plaintiffs do not plead sufficient factual allegations to make a plausible claim against Kinney and Val Verde County because they (1) fail to identify a plausible policymaker and (2) fail to identify an official county policy. (Mot. Dismiss, Dkt. 29, at 13–17; Mot. Dismiss, Dkt. 35, at 10–13). First, the Court disagrees that Plaintiffs fail to identify an official county policy. Plaintiffs clearly allege in their complaint that both Kinney and Val Verde Counties had specific policies, which Plaintiffs describe at length, concerning the release process of individuals arrested pursuant to OLS. (Compl., Dkt. 1, at 26–27). Plaintiffs further allege that the overdetention of "people in Defendant counties' custody occurred so regularly that it reflected and constituted a widespread practice or custom." (*Id.* at 33).

Second, at the motion to dismiss stage, Plaintiffs are not required to "plead the specific identity of the policy maker." *Groden v. City of Dallas*, 826 F.3d 280, 285 (5th Cir. 2016); *see also Pena v. City of Rio Grande City,* 879 F.3d 613, 623 (5th Cir. 2018). Rather, Plaintiffs need only allege facts that show an official policy, promulgated by the policymaker, under which the municipality is said to be liable. *Pena,* 879 F.3d at 623. Plaintiffs allege that Sheriff Coe and County Clerk Alvarado are final policymakers for Kinney County and that Sheriff Martinez is a final policymaker for Val Verde County. (*Id.* at 24, 28). Specifically, Plaintiffs plead that Sheriff Martinez "designed the release procedures for persons arrested in Val Verde County under the 'catch and jail' program and held pursuant to Val Verde County authority, (*id.* at 24), and that Sheriff Coe "designed and implemented the release procedures for persons arrested in Kinney County under the 'catch and jail' program and held by Kinney County's purported authority, (*id.* at 28). Alvarado "is responsible for generating case disposition paperwork including by creating sentencing documents showing someone has pled no contest or guilty, was convicted, and was sentenced to credit for time served." Plaintiffs also plead that Alvarado is "responsible for transmitting that documentation to relevant parties, including to the Kinney County Court, which in turn sends the paperwork to Defendant Coe." (*Id.* at 28–29).

27

Additionally, Plaintiffs plead that during a court proceeding in January 2022 concerning the ongoing overdetention of Ruiz de la Cruz, an individual identified as a coordinator explained that the Clerk's office "took an indeterminate number of days to stamp the plea paperwork" for OLS cases. (*Id.* at 25). Plaintiffs sufficiently plead that Sheriff Coe, Sheriff Martinez, and County Clerk Alvarado promulgated official policies in their respective counties that resulted in Plaintiffs' overdetentions, as discussed above in Section III.B.2.

Further, Kinney and Val Verde Counties' arguments that Sheriff Coe, Sheriff Martinez, and County Clerk Alvarado cannot be final policymakers because they are subject to the orders of the county courts, (Mot. Dismiss, Dkt. 29, at 15; Mot. Dismiss, Dkt. 35, at 11), are irrelevant to Plaintiffs' claims that Defendants created and enforced policies that delayed the execution of court orders for release. Plaintiffs do not allege at any point that their overdetentions were caused by delays of the county judges but rather the subsequent actions of Defendants. Accordingly, the Court finds that Plaintiffs have sufficiently pled claims against Kinney and Val Verde Counties under *Monell.*

### E. Section 1983 Private Government-Contractor Liability

In its motion to dismiss, Recana argues that Plaintiffs fail to sufficiently plead their overdetention claims against Recana because Plaintiffs do not allege that "any individual from Recana was personally involved" nor do they sufficiently allege that Recana enforced a policy or practice resulting in their overdetentions. (Mot. Dismiss, Dkt. 59, at 8). In response, Plaintiffs contend that (1) they only have to plead enough facts to show that Recana was vicariously liable for Plaintiffs' overdetentions as the *Monell* framework does not apply to private entities; and (2) even if Recana cannot be held vicariously liable, Plaintiffs sufficiently state an overdetention claim against Recana under *Monell.* (Resp., Dkt. 71, at 11–12).

The Fifth Circuit has never "squarely decided whether plaintiffs can hold *private* defendants vicariously liable under § 1983." *Moore v. LaSalle Mgmt. Co., L.L.C.*, 41 F.4th 493, 509 (5th Cir. 2022) (emphasis in original). However, the Court will follow several circuit courts and federal Texas district courts in holding that private companies contracting with the government cannot be held vicariously liable pursuant to a Section 1983 claim. *See Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 790 n.2 (7th Cir. 2014) (gathering circuit cases); *see also Olivas v. Corrections Corp. of Am.*, 408 F. Supp. 2d 251, 254–55 (N.D. Tex. 2006); *Brown v. McLane*, No. EP-13-CV-00017-FM, 2018 WL 9868737, at *5 (W.D. Tex. Aug. 17, 2018), *aff'd*, 807 F. App'x 410 (5th Cir. 2020). Thus, it is not sufficient for Plaintiffs to allege vicarious liability against Recana.[7] Rather, Plaintiffs must establish the existence of all of the following: (1) a policymaker; (2) an official policy; and (3) a "violation of constitutional rights whose 'moving force' is the policy." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (quoting *Monell*, 436 U.S. at 694); *see also Moore*, 41 F.4th at 509; *Olivas*, 408 F. Supp. 2d at 254–55. The "standards applicable to determining liability under § 1983 against a municipal corporation are applicable to determining the liability of a private corporation performing a government function." *Id.* An official policy may be discovered in "written policy statements, ordinances, or regulations, but it may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Peterson*, 588 F.3d at 847. "For the moving force element, a plaintiff must show either that the policy itself was unconstitutional or that it was adopted with deliberate indifference to the known or obvious fact that a specific constitutional violation would follow." *Liggins v. Duncanville, Texas*, 52 F.4th 953, 955 (5th Cir. 2022) (internal citations omitted).

---

[7] The Court notes that even if Plaintiffs could hold Recana vicariously liable under a Section 1983 claim, Plaintiffs' complaint fails to plead any facts relevant to vicarious liability. Plaintiffs never mention that their injuries were caused by Recana employees acting within the scope of their employment. Rather, Plaintiffs plead facts about Recana's policies and deliberate indifference to Plaintiffs' overdetentions, suggesting Plaintiffs believe that their claims more properly belong under the *Monell* framework.

In their complaint, Plaintiffs plead that Recana was "responsible for creating and implementing internal policies for processing the detention and release of individuals detained under the 'catch and jail' program." (Compl., Dkt. 1, at 31). They further allege that Recana "created and implemented policies at the VVTPC that resulted in release paperwork being processed days to weeks after being received." (*Id.*). Plaintiffs also allege that OLS detainees are transported back to VVTPC after their release, where they remain in a cell without legal cause until they are transported to federal immigration facilities. (*Id.*). Plaintiffs plead that Recana was deliberately indifferent to Plaintiffs' overdetentions because it was aware of the pattern of overdetention of OLS detainees, yet it failed to address its delayed paperwork processes. (*Id.* at 32, 34–35).[8]

Recana argues that Plaintiffs fail to allege a specific Recana policy that was the moving force of Plaintiffs' overdetentions. (Mot. Dismiss, Dkt. 59, at 10). The Court disagrees. Plaintiffs allege that Recana had a policy of delaying release paperwork that it received as part of the larger release process for OLS detainees and that these delays contributed to Plaintiffs' overdetentions. This level of specificity is sufficient to survive a motion to dismiss. Recana further argues that Plaintiffs fail to allege that any individual at Recana was a policymaker. (Mot. Dismiss, Dkt. 59, at 9). As the Court explained in Section III.D, at the motion to dismiss stage, Plaintiffs are not required to "plead the specific identity of the policy maker." *Groden*, 826 F.3d at 285; *see also Pena,* 879 F.3d at 623. Rather, Plaintiffs need only allege facts that show an official policy, promulgated by the policymaker, under which Recana is said to be liable. *See Pena,* 879 F.3d at 623. The Court finds that Plaintiffs, by alleging that Recana oversaw VVTPC and had a policy to delay paperwork resulting in Plaintiffs' overdetentions, sufficiently plead that such a policy would have been promulgated by Recana's

---

[8] The Court discussed Plaintiffs' pleadings as to the deliberate indifference of Defendants in Section III.B.2. Plaintiffs' complaint alleges that Recana, alongside all of the individual Defendants, was aware of the pattern of overdetentions of OLS detainees, received and forwarded complaints of overdetentions, and handled release paperwork that indicated a detainee was entitled to immediate release.

policymaker. *See Groden*, 826 F.3d at 285 ("The allegation that an official city spokesperson announced an official city policy allows for a reasonable pleading inference that this . . . policy was attributable to an official policy made by the policymaker of the city.") Therefore, the Court finds that Plaintiffs sufficiently plead their overdetention claims pursuant to Section 1983 against Recana.

### F. Negligence

Finally, the Court reaches Plaintiffs' negligence claim against Recana. In addition to the other factual allegations made against Recana that have been discussed in this order, Plaintiffs allege that Recana "functioned as Plaintiffs' jailer and administered Plaintiffs' detention, and so assumed the duties of care imposed on jailers under Texas law." (Compl., Dkt. 1, at 36). Plaintiffs further allege that "[a]s a jailer, Recana owed Plaintiffs a duty to effect their timely release once the legal authority to detain them had expired" and that "Recana breached its duty of care by designing and implementing policies and practices that delayed Plaintiffs' release," causing their overdetentions and subsequent injuries. (*Id.*).

In Texas, a claim for negligence requires three elements: (1) the existence of a legal duty; (2) a breach of that duty; and (3) damages proximately caused by that breach. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 535, 540–41 (citing *HSI Cedars Treatment Ctr. of De Soto, Texas, Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004)). Assuming that Plaintiffs' allegations are true, the Court finds that Plaintiffs sufficiently plead each of these elements against Recana. Recana argues that Plaintiffs' allegations regarding negligence are "mere conclusory allegations," (Mot. Dismiss, Dkt. 59, at 13), but Plaintiffs plead specific facts about why Recana has a duty to Plaintiffs, how Recana breached that duty by delaying paperwork and detaining Plaintiffs after their releases from prison, and how this breach caused their overdetentions and the resulting injuries. Therefore, the Court will not dismiss Plaintiffs' negligence claim against Recana.

## IV. CONCLUSION

For the reasons given above, **IT IS ORDERED** that Defendants' Motions to Dismiss, (Dkts. 29, 35, 47, 51, 59, 68, 69), are **DENIED**.

**SIGNED** on June 25, 2024.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE